This is our first case of the day, Kent v. Patel, et al, et al, et al, and this is case number 4241120. Counselor for the appellant, please introduce himself. Good afternoon your honor, it's Michael Eliot for Mr. Kent. Look how old I am. Keep your voice down. And for the appellate. Good afternoon, Margaret Rose on behalf of the physician assistant, Jeremy Good. Good afternoon, Anne Barron on behalf of Dr. Berry, Dr. Kim, and their group of specialists in medical imaging. Peter Bray on behalf of RIT, Jeremy Good. Are you comfortable with how you've divided your time? Yes. And you'll stick to it? Yes. Okay. You may proceed. Oh, and the other thing, that doesn't amplify, it just records. Okay. May it please the court. My name is Michael Belioni and I am here today representing Mr. Todd Kent. Today we are asking this court to overrule the trial court's order denying conversion of respondents Jeremy Good, John Kim Jr., Gregory Neary, and specialists in medical imaging from respondents in discovery to defendants. It's our position that reversing that order is proper for two reasons. Number one, probable cause to convert under 2402 was established per Illinois Supreme Court and appellate court precedent. And secondly, the respondent's conversion avoidance arguments made in the trial court were improper per that same precedent. With respect to point one, in Cleeton versus SIU Healthcare, a 2023 decision, the Illinois Supreme Court held that probable cause to convert a respondent under 2402 is established through submission of a proposed pleading containing allegations of negligence against that respondent as well as an expert report outlining duty, breach, and proximate causation. Does it say automatically that or that may? That might be enough. Judge, I think it gets almost all the way to saying it was automatic. Almost? Almost. It's paragraphs 38 through 44 of the opinion. And the court's requirements are sufficient to sue a medical provider directly. It would be inconceivable, the Supreme Court's words, to make it more onerous to convert a respondent. And so in this case, I really feel there is no dispute. The trial court was provided a proposed amended pleading containing allegations of negligence against each respondent and expert reports from board-certified specialists opining as to duty, breach, causation, and injury. Can I interrupt you there? Of course. I don't disagree with that. I want to jump to Dr. Kim and your expert affidavit. Case law says that everything has to be speculative, no conjecture, reasonably certain. Your expert affidavit regarding Dr. Kim said that the finding of air within the penis constituted an emergency finding that if unacted upon could potentially result in severe harm. That's not certain. That's a possibility. That's speculative. So how do you reconcile that? I think the medicine here, Your Honor, is such that the longer forniae sconc gangrene, excuse me, goes unacted upon. You go on a whole team of providers. Dr. Kim was in Austin, correct, reading the CT scan from July 11th. And then on all those days, all the way up until his ultimate discharge, he was seen daily, correct, by urologists, surgeons, infectious disease, you name it. So he was being acted upon. He was seen, Judge, in the sense that he was in the hospital. But the standard of care required treatment for forniae gangrene simply was not provided to Mr. Kent. And that would be a debridement of dead and dying tissue and antibiotic irrigation. So yes, you're absolutely correct. He was in the hospital. But our experts' opinions, and it's not simply the radiology expert, but all of the experts' opinions that we've attached to our complaint, substantiate that Mr. Kent was not provided with sufficient care under the standard. And the longer he goes, Your Honor, the longer the infection is allowed to progress, the more and more tissue is eroded away, and the more and more likely it is that he will suffer the amputation that unfortunately resulted. Correct. So let me ask you this. So on the 14th, when Dr. Neri read the CT scan, it still was not acted upon. It was actively in his medical records. Gangrene, necrotic, fasciitis, however you say that. And the team still didn't do anything. So how is it then that liability, proximate cause, falls back on Dr. Neri and Dr. Kent? So for that, Your Honor, I would pivot the court to the Illinois Supreme Court case of Snelson v. Cam, as well as this court's holding in Belknap v. Crawford, which is a 2024 case, and the First District's holding in Buck v. Charlotta, which is a 2013 case. All of which stand for the proposition that in a failure to communicate case, the causation chain is not broken by a subsequent provider's negligence. Meaning simply this, if this case were at a summary judgment stage, we could disclose a 213F3 expert to say, had Dr. Neri called me as the ordering provider, and had I been told by Dr. Neri that this could only be a growing abscess or Fortier's gangrene, here is what I would have done with that information. And so the trouble here is that if we were later on in the case, at the summary judgment stage, the plaintiff would have the ability to utilize that evidence to resist summary judgment. But here we are at the pleading stage, and that's being nullified because conversion is being denied. And so in reality, what's occurring is it's becoming more difficult to convert than it is to withstand summary judgment. And what that does, Your Honors, is it contravenes the holdings in Clayton, Ingle, Moscardini, Williams, and all the progeny of those cases which say that 2402 is not a substantive defense on the merits. It's not a summary judgment or directed verdict style proceeding. It's not a quasi-trial where respectfully the trial court is to weigh evidence. It is a pleading issue where according to the Supreme Court, if you present a pleading containing allegations of negligence and an expert report outlining duty, breach, causation, and injury, then according to the language in this court's opinion in Steinberg v. Dunseth, you have the ticket to proceed. And if the respondents feel that there are errors in the expert report that somehow nullify the expert's causation opinions, then according to that same decision, Steinberg, as well as the First District case in Williams, as well as the Illinois Supreme Court case in Clayton, that is an issue that can be raised on summary judgment. And those are arguments that can be made before the trier of fact. But respectfully, they are not to occur at the conversion stage. Well, if you are of the opinion that Clayton is an automatic conversion, then why even have the statute? Because isn't the role of the court to be the gatekeeper? Because you can get an expert report that says anything. I think everyone would admit to that. I'm not saying you did, but we all know. Everyone argues that. So what's the purpose of the statute and the role of the court if we're not to be the gatekeeper? And I understand what you're saying. We're not to weigh the evidence, so you don't need to get into that. The standard for converting a medical negligence respondent in discovery to a defendant is more onerous, Your Honor, than converting any other type of respondent to a defendant. For example, I believe the McGee case from the Fourth District allowed conversion in a trucking crash where the allegations in the pleading alone sufficed to meet the probable cause standard. When you're dealing with a medical malpractice lawsuit, you do have to go out and get an opinion from a physician in the same discipline providing opinions on duty, breach, causation, and injury. So that is the most onerous conversion standard that the law allows. And again, this doesn't leave the respondents who respectfully we feel should be converted to defendants without recourse. They are free to re-raise all their causation arguments in a motion to dismiss and or a motion for summary judgment. And as the case moves on a directive-finding motion, so they certainly have recourse. But I think what Cleeton clearly outlines is that the trial court in its gatekeeper function is looking for specific evidence. And that's the pleading with the allegations of negligence and the reports. And that's disparate from a weighing of the evidence. Because in Cleeton, the respondent attempted the same conversion avoidance argument as here, which was to say the discovery evidence contradicts the expert's opinions. And the court, it's right at paragraph 18, your honors. It's succinct, but it is there. They say that whether there are contradictions and whether the respondent's conduct truly was a proximate cause of harm is an issue for the trier of fact. And the Williams court said the very same thing. I would suggest to the court, the respondents have not cited a decision in Illinois jurisprudence holding that they can resist conversion by asking the court to pick apart the expert's opinions and weigh evidence and nullify proximate causation. In that respect. And I think they haven't done it not out of a want of effort. It's because there is no such decision. Well, how do we reconcile? Because Cleeton does say that you have to have evidence, facts from your expert that would cause an ordinary, that would cause a person of ordinary caution and prudence to develop an honest and strong intelligence, was a proximate cause of plaintiff's injuries. That's right out of Cleeton. So how does reverting back to Dr. Kim, the fact that he's presented with an order with the chief complaint was abdominal pain, and then he noted a little gas bubble, which he thought was from the catheter. How does that convert then, leading a person to a strong and probable suspicion of later this horrible injury? Because your honor, the expert report outlines that gas in the soft tissue of the penis and the corpora is indicative of dead and or dying tissue. That that constitutes a medical emergency. That gas does not naturally exist in that part of the body absent gas forming bacterial infection. And that the standard of care that was required of Dr. Kim was documentation of the gas in his report, which was not done. Communication of the finding to the ordering provider, which was not done. And confirmation that the finding would be acted upon, which was not done. And so practically speaking to a person of ordinary prudence and intelligence, as you said, your honor, what that allowed was a chain of dominoes to keep falling where this bacterial infection was not properly diagnosed and not properly timely treated. It wasn't properly treated with a debridement and antibiotic irrigation until 10 days later. And provided to the trial court and in the trial record are the intervening imaging studies showing the increase in gas by the 14th, which is indicative of more dead and or dying tissue. And then finally, and I apologize for the terminology in this case, but an MRI on the 21st which showed a necrotic penis, which means it was dead and needed to be amputated. There were no images. We just had the readings, the final readings. Correct. I just wanted to confirm that. And I would respectfully add, the court, the trial court and this court was also provided with the expert reports explaining those findings, as well as deposition testimony. For example, Dr. Wigington, who agreed with our experts that there was a gradual decaying and death process that was allowed to go on. But Dr. Wigington also testified that she reviewed the 7-11 CT and the 7-14, so Dr. Neri and Dr., excuse me, Dr. Kim and the Dr. Neri's CTs, and she said she wouldn't have considered that an urgent finding. She did say there was an expansion of gas, which is what caused the concern from the ultrasound. But she said she wouldn't have considered it an urgent finding. How does that impact the court's analysis? So she said, she testified that she would have documented gas in the corpora, but that she would not necessarily have called the ordering provider concerning the finding. She recognized what she saw in a July 14 ultrasound as a continuation of an infectious process that started on the 11th. But the larger point here is Dr. Wigington, who was a former respondent who was not converted, she does not determine the standard of care and whether the conversion requirement of probable cause has been met. That's where we revert to what does the Illinois Supreme Court say? And the Illinois Supreme Court says, if you have the pleading and you have the expert report, then you have the right to convert and probable cause is established. And actually, in Clayton and in the predecessor cases that I mentioned a moment ago, they say that does, it's that information which engenders in an ordinary, cautious, prudent person a reasonable suspicion that the respondent's conduct was indeed a proximate cause of harm. So then, I'm just continuing to play devil's advocate with you. Why have an evidentiary hearing? If all you need is a pleading and an affidavit, why have an evidentiary hearing? Because your Honor, again, I would respectfully suggest that's a more onerous requirement that it would take to convert any other type of defendant in any other case. So the trial court in performing its gatekeeper function and making sure that the plaintiff has those things, it certainly is not nothing. It's more than would be required in a truck crash case, in a products case, any other type of case. And if we didn't have that evidence, the trial court may have indeed been right. But I think the error that was made here was a looking behind that evidence and weighing of it and saying, well, these respondents have some defenses that they're arguing here. Those defenses are for trial. There was no intent, according to the Supreme Court, to make a 2402 probable cause hearing into a mini-trial. And that's what we feel the error was made here. So is that why plaintiff didn't submit any evidence in support of its motion to convert? Judge, we did submit the complaint and we submitted our reports and I submitted the medical record evidence to the trial court but didn't make it part of the record because of how sensitive it was. I know it is part of the record now because my colleagues representing the respondents did indeed file it with the court. So it is properly before your honors and there is case law which holds that evidence supporting probable cause and the determination of probable cause can actually be submitted all the way up past the 2402, excuse me, six-month time period. So it's our position that this court truly need go no further than Clayton, Ingle, Williams, and Moscardini in reversing the trial court's order. But if the court cares to, I briefly speak to two things. The physician assistant, Good, took the position that he could not be converted because probable cause was nullified because he was a mere scribe, a writer, not a treater in this case, and because he always saw Mr. Kent with his attending physician who must have known more than him so nothing he could do or not do would be approximate cause. With respect to the latter point, there's no case cited for the proposition that a PA cannot be deemed approximate cause because he's overseen by an attending. And we've cited Swierdnia v. Zaborowski which is a First District 1989 case holding that a resident in identical circumstances can indeed be approximate cause. So we feel that that is legally improper argument. With respect to the scribe argument, PA Good's CV, ID badge, privileges, written supervisory agreement all identify him as a treater, not a writer. His chart notes from July 13th through 16th all chart out and sign by him that he saw the patient, took a review of systems, conducted a history, reviewed relevant laboratory results and imaging studies, and he formed a detailed patient care assessment and plan. And we know other providers were calling him including infectious disease providers and providing updates on the state of Mr. Kent's penis and they said they did that. Angela Gillespie, a physician assistant, said she did that because PA Good was a provider. And she said she knew that because she checked the chart and saw he was a urology provider and or called the hospital operator and said I need to know who's on for urology and was put in touch with PA Good. And in fact she said I never would have called him if he was not a provider. Which is to say all of those things create fact questions. Once again, that if we were at the summary judgment stage, it would render entry of summary judgment on these duty and causation arguments improper. But to come back full circle, we're not there yet. We're still at the pleading and conversion stage. Can I pivot you before your time is up? Of course. On your motion to supplement the motion for reconsideration, so we're moving on down the road here. How are the discovery depositions that you tried to submit not newly discovered evidence? Well, there's two points there, Your Honor. Can I continue despite perhaps being past my time? I would like him to. Yes, please. Thank you. First off, the record shows that we were actively seeking those depositions through obtaining four court orders, through making seven separate requests for deposition dates, and then taking those depositions of PA McLean and PA Gillespie on the very first date offered. So although the deposition transcript may have been new, the request for it was a better part of a year old. And due diligence was... I'm going to disagree with you that that's in the record. There's a few email communications for general proposition you're trying to get discovery depths, but it doesn't specify, and I didn't see it in the report of proceedings either, what depositions you were trying. So this is my next question. I mean, that's fine. I believe you. But why not move to continue the hearing on the motion to convert? Because you knew of Gillespie. You knew of McLean. So why not continue the hearing? We did attempt to continue the hearing, Judge. We attempted to continue it in November of what would have been 2023, and we were given approximately a month to take the discovery that was needed. Right. But the point I'd like to stress to the court is, during the conversion hearing itself, the plaintiff took the position that the respondent's making the argument of, here's what every medical provider in this case knew and understood and will testify to. It was pure conclusion because those folks had not yet testified. The first two depositions we took after that hearing, lo and behold, P.A. Gillespie and McLean come in and say, we didn't know about this gas. We didn't think that this gentleman was a scribe. And so even if the court doesn't consider the transcripts, which we feel there's a law in Coley v. St. Bernard and Shanklin v. Hutzler saying they should be considered, the conclusory allegations that were made that every provider will testify this way were without support. We'll hear from you in rebuttal. Thank you. Thank you so much. May it please the court, as I mentioned at the onset of this hearing, I represent Physician's Assistant Good. It is our position that probable cause was not sufficiently established in order to convert Physician's Assistant Good from an RID to a defendant. The standard is that evidence would be presented at an evidentiary hearing whereupon the judge would act as, I believe the term that's being used here today, as a gatekeeper. Someone who looks at the evidence that's been presented and would, based on that evidence, conclude that an ordinary, cautious, and prudent person would have an honest and strong suspicion that that RID's alleged breach was a legal and factual cause of the alleged injury. Plaintiff's counsel, in his brief, conflates both this standard of a 2622 as well as summary judgment. We have a clear and articulable standard as it relates to converting an RID from a respondent in discovery to a defendant. So I'm not sure why that conflation is happening on that end. But the case law is pretty clear. The case law the plaintiff relies on pretty heavily. Clayton, Williams, Ingalls, Muscadari, all, I think the first, all involve evidence that was presented beyond the 2622. In all of those cases, at some point, there was additional information that was put in front of the judge for the judge to review and come to that determination one way or the other. So I think the case law strongly supports the fact that a 2622, that threshold, is not sufficient to get a plaintiff over the hump to convert an RID to a defendant. We have that established standard that is a higher threshold. And I don't think that is cause to change the law in that regard. If a legislator wanted there to be the same standard between a 2622 filing an action against a defendant and converting an RID, we wouldn't have the plain language in that statute about probable cause. Additionally, all of those cases hinge very much so on the facts that are put in front of the judge in making that determination. Here, we have a situation where a physician assistant functioned. His role in the care of this patient was tantamount to a scribe. It doesn't matter what his license would have allowed him to do. It doesn't necessarily matter what his education and training should have informed him of. At every single time, and this was his testimony, every single time he saw a patient in his role at Surgical Affiliates, he was accompanied by a board certified urologist. Isn't there a dispute about that? Your Honor, I don't think so. His testimony is not contradicted by any sort of sworn statement. What plaintiff is hanging his hat on in this regard is the medical records, which that's explained in physician assistant Goode's deposition, that he would have been the one holding the electronic device, making the documentation as Dr. Stiger was doing the physical examinations, was getting the history, was entering orders. That's why his name is appearing in those records. And that's his testimony. Plaintiff doesn't have and didn't have at the time of the conversion hearing any evidence to suggest otherwise. And then I would go on to say that plaintiff's assertion that the court should have considered physician assistant Gillespie's testimony that was later collected is, of course, untimely. I think plaintiff is conflating this idea of evidence that is collected during that six month or whatever reasonable extension plaintiff receives with evidence collected after conversion has been denied. Because that's what the case law says. There is evidence that or there is case law that supports that a plaintiff can put forward evidence at that conversion hearing, but not thereafter. So to the extent physician assistant Gillespie's testimony contradicts physician assistant Goode's testimony, it was appropriately not considered by the trial court. I would also argue it's not inconsistent. His exact role in this patient care was tantamount to a scribe, but he was employed as a physician's assistant and that's what her testimony was. There's not an inconsistency based on those specific sworn statements. Why does one use a professional skilled physician assistant as a scribe? I believe you'd have to ask Dr. Steiger that. It's my understanding that that was how that practice was run and that typically the physician's assistants who were employed in that capacity did not independently see patients in the hospital. I think the emphasis should of course be what care and treatment was actually provided. The actual role that this professional had in the care and treatment. As I said, these kinds of determinations as it relates to probable cause are very fact specific. Didn't P.A. Goode testify that he performed a physical history and physical and formulated a plan and then that was signed off on by Dr. Steiger? The testimony was that Dr. Steiger performed the exam, the history and physician's assistant Goode documented it, presented that documentation to Dr. Steiger and it was attested to at that point in time. That's why both of their names will sometimes appear in the medical record. But P.A. Goode never had any training as a scribe. He went to school to be a physician's assistant, correct? He did. He did. I think that's uncontroverted. Plaintiff's counsel brought up, and I am going to butcher this case name, Seritina regarding the resident who argued that because they were constantly supervised by an attending physician that they could not be held liable for the care and treatment that they rendered. I think it's important thing to first point out the fact that this resident actually did provide care. Thing to first, this resident was an M.D., high level of license, was simply being supervised by someone who had more experience. In this particular matter, we have a physician's assistant, different license, different level of experience, being supervised, not just supervised, essentially following along Dr. Steiger in the care and treatment of this patient. He can absolutely defer to the board certified urologist he is working alongside for things like determining orders, the plan of care, rendering diagnosis, rendering differential diagnosis, so on and so forth. So I think there is a clear distinction there between the case that plaintiff put forward. Are there any instances in which Goode saw a patient without Steiger accompanying? According to his testimony, no. If he was just a scribe, why would Gillespie contact him? Wasn't there testimony that Gillespie or someone, I can't, I'm not positive it was Gillespie, some other medical provider reached out to Goode? So there are two phone calls that are at issue in this case. The first comes from P.A. Gillespie. That testimony, of course, was collected after conversion was denied. I think the first. Thank you for that. That shouldn't be considered. There is another provider whose testimony was obtained before that conversion hearing and they could not recall if they called P.A. Goode or Dr. Steiger. They just contacted urology. When P.A. Goode was asked about that phone call, he could not recall it. So as far as we know, based on the evidence that the trial court was going to consider during the probable cause hearing, no one contacted P.A. Goode. Okay. Are there any more questions? I see I'm almost out of time. Perfect. Thank you. Good afternoon, Your Honors. Ann Barron from Heil Royster, from Drs. Neri and Kim, and then their group specialists in medical imaging. And I just want to talk, I know you are familiar with the Gleaton case. I argued that case before this court and I know Your Honor is familiar with it as well. But I think importantly, we're bound by the Illinois Supreme Court's decision in Gleaton, but let's actually look at it. If you actually look at the decision in Gleaton, it talks about all the evidence that can be submitted on a 2402 motion to convert. Nowhere in that case does it say, yes, just because plaintiff submits the motion to convert with an amended complaint and the 2622 certificates of merit, does that mean this needs to be rubber stamped? If that was the case, then why do you have the court, the trial court, as the gatekeeper? Why do you even have the motion hearing? Rather, Keith Gleaton, not once but twice, discusses the affidavits, the depositions, the medical records, the x-rays, and the other matters that may be submitted on the motion to convert. And in doing so, this court, or the Gleaton court, actually discusses this court's decision from Engel, which was many years before. So we have a situation where the plaintiff has to go forward with the evidence. And we would ask that you really look at that evidence, which I believe you have, and say, what does this evidence mean? Did the plaintiff meet their burden of proof? And it's plaintiff's burden. Whether that burden be low, whether it be medium, whether it be high, it is plaintiff's burden. And you can't just rubber stamp that. So in this case, it was actually my client who submitted deposition transcripts and some medical records and interrogatory answers to explain what their role and what their involvement was. And importantly, my clients as radiologists are not providing hands-on day-to-day treatment at the bedside. They're reviewing CT scans in this case. Dr. Kim, he reviewed the scan from July 11th. Dr. Neri, he reviewed the CT scan from July 14th. In between, there was Dr. Wigginton on July 14th as well, who did the transabdominal, or reviewed the transabdominal ultrasound. She documented, I have a concern for necrotizing fasciitis. That's what led to the subsequent order for the second CT scan. Dr. Neri, what did Dr. Neri do? In his report, he documented the finding of gas. He described it specifically, where it was, and the dimensions. He also said, I have a concern for necrotizing fasciitis. And I know you're going to see that word throughout the briefing, and it's also, when it's in a specific part of the male genitalia, that's what becomes the fornier's gangrene. So it's not two different disease processes, it's really just one. But what does plaintiff say about Dr. Neri's actions hearing? Plaintiff, in his original complaint that was filed in January of 2023, when there were no respondents in discovery, said, Dr. Neri, he correctly and accurately interpreted the CT scan. That continues through all of his complaints, including, I believe, maybe even a fifth amended complaint, or fourth amended complaint that was filed after the motion, the conversion hearing. So you have to go into an analysis of the case with the facts and the procedural history. I would maintain here, plaintiff named 14 respondents in discovery. I personally think that's a lot. That might be the most I have ever seen. And he did that just before the statute of limitations expired. And what did that do? That essentially gave him another six months on the statute of limitations. Actually a little longer here, because the hearing didn't happen until February. But that means something. I think it does, Your Honor. Plaintiff is getting an advantage of that six months additional period of time to conduct discovery. That often happens in cases where you may not know as a respondent discovery, and unfortunately I have clients who this has happened to that, oh my gosh, I might be a target here, or oh my gosh, I think plaintiff's going to convert me. So it's like plaintiff's taking advantage of the situation to extend the statute of limitations, maybe unfortunately, I hate to say this, catching somebody not prepared for their deposition. So they get an advantage by being able to take depositions, due discovery on respondents in discovery, and extending that statute of limitations. Now if plaintiff wanted to, if plaintiff knew, yeah, I'm just going to run out and get a 2622, but I haven't had time, there's actually a procedure in the 2622 certificate of statute which allows a plaintiff to seek more time, say statute of limitations is running, I haven't had an opportunity to get my certificate of merit, I'm filing, I want more time. But here if plaintiff's going in knowing I'm going to use the respondent discovery statute here, the plaintiff needs to be prepared. The plaintiff needs to be on top of it. It's a lot of discovery to do in a short period of time. So when we get to the motion to reconsider and then supplement to that motion, adding in Gillespie and McLean, I would say that's a classic, I lost a motion, I'm ready to run out and get more evidence, and I'm going to submit that on my motion to reconsider and then call it new evidence. Illinois law does not allow that. Illinois, the Navistar, Garner versus Navistar case is pretty much on point on that in saying you can't lose a motion, run out and get more evidence, and then file a motion and reconsider saying I got more evidence, please reconsider, I have this newly discovered evidence. So they have to comply with the statute, and it's our position that the material submitted by plaintiff could not just be rubber stamped, they had to be evaluated in full by the trial court who was acting as the gatekeeper role, and the trial court made the right decision here. He evaluated all of the evidence in allowing or in denying the motion to reconsider, and I would actually suggest that you look at the transcript from the hearing, because his order doesn't really go into all the reasons why, the order says look at my reasoning from the transcript from the hearing, and he discusses this concern for the probable cause standard, and what does that really mean? It doesn't mean a rubber stamp. No, it's actually requiring facts to support the honest and strong suspicion, it doesn't say any suspicion, it says an honest and strong suspicion that the purported negligence of the respondents in discovery was a proximate cause of the plaintiff's injury, and I think it's important that that language, proximate cause, be analyzed, especially in the context of a medical malpractice case, where proximate cause is a key element. It doesn't mean, proximate cause in a medical malpractice case doesn't mean that simply because somebody had a bad outcome means that there was negligence, and in this case you have other providers at Methodist, you have urologists, you have surgeons, you have internists, internal medicine specialists, and you have an infectious disease specialist, seeing this plaintiff on a day-to-day basis. Well, I'll just interject if you don't mind. What Clayton does instruct us is that to establish probable cause under the code, the burden is low in that it should be liberally construed, and then there's the one time when the court can sort of weigh things, and that is the substantial rights of the parties. Correct. So here, my clients, again, not day-to-day, and if you look at the substantial rights of the parties, I think that's part of what the court, the trial court, focused on. He was looking at that evidence that was submitted and saying, essentially, I think he uses the word fair. I'm not sure that's necessarily the right word, but he was evaluating what was presented to him. So you're going to have this rubber stamp. Why is there even a need for the statute? Why do you even have to have the hearing? I think what's troubling to me about that argument is we sort of begin to creep into a trial-of-a-fact situation. If, in fact, the code, according to the code, there's enough evidence presented potentially to go forward, then we go to this low-standard language, Clayton, those types of things, to take the next step. So the court sort of weighing the level of evidence is concerning. I would say trial court judges do that a lot. They do that when things come before them. Clayton does say low. The cases coming before Clayton do say low, but low does not mean none. And the judge needs to take that on in that individual's role as a practitioner, as a judge, and evaluate what is presented before them. And here, the materials initially presented by the plaintiff, he was asking if they'd be rubber stamped. I believe what the plaintiff ended up presenting was most of the same information and materials that my client had submitted, the medical records and some deposition transcripts and affidavits. And that, you have to look at it from my perspective too. If we didn't think that was in our favor, we wouldn't have submitted that. We would have just said, plaintiff, you haven't met your burden just by submitting the proposed submitted complaint and the certificate of merit. How do you evaluate without weighing? Tell me the difference in those two words. Sure. I think you look at it objectively. Is what the plaintiff submitted here, and a little bit of focusing on proximate cause, which is different than probable cause, but is what plaintiff submitted subject to speculation, guess, conjecture? Is it a what might have happened as compared to facts? So I think the trial court is looking for the facts, not how I might argue what those facts mean. Thank you. Mr. Figueroa, we'll hear from you on rebuttal. Thank you, Your Honors. How does a lay person, a judge, a non-medical provider, evaluate whether the probable cause threshold has been met? Because judges are not medical providers. That's why Cleton doesn't use the term rubber stamp. Neither does Williams, Engel, or Moscardini. They require a report from a medical expert in the same field and specialty as the provider sought to be converted, establishing that they breached the standard of care and proximately caused harm. Because Your Honor, where does it end if a trial court judge is allowed to look behind the expert report and weigh the evidence and decide, I as a lawyer think that this board is this provider and not going forward, then we have the judge acting as a jury. And that's the point of Cleton. And I would just add again, you know, but what does gatekeeper mean? Gatekeeper means you look for specific evidence as detailed by the Illinois Supreme Court. Not that you go beyond that, always respectfully, judges, and weigh the evidence and say, well, I know the expert said here that the radiologist needed to make a personal communication of an emergency finding, but we think that the respondent has some good positions that might constitute a defense at trial. That's for the trier of fact. It's a paragraph 18 of the Cleton opinion and it's in Williams as well. I'm sorry to argue with you, but why have the statute? Your report says that when you The purpose of the statute, again, going back to the weighing, I'm sorry. The purpose of the statute, judge, is to put a medical negligent plaintiff to the same exact burden that they would have to meet in suing a provider directly as in converting them to a respondent. And the case law talks about if we don't do this, if we make it more onerous, there would be a reversion to the time period where plaintiffs simply named everyone as defendants. That's why. I would say to the court, the claim that it's undisputed that PA Good is a scribe is simply not true. The medical records which were submitted within the six month time period for conversion document phone calls from PA Gillespie to PA Good. That's no dispute. That was timely submitted. PA Good verbatim in his deposition says he cannot confirm that Dr. Steiger was with him every time he saw Mr. Kent. This is a quote straight out of our reply brief looking at the record from July 13th. That's the first day PA Good saw Mr. Kent. Can you tell me one way or another whether Dr. Steiger was in the room with you when you saw Todd? Answer, no. If this were summary judgment, that fact and all of these facts would be construed in the plaintiff's favor. So why at the conversion stage are we conducting a weighing of evidence and deciding, you know what, I the trial court judge feel that it's undisputed or it's determined that this gentleman was a near scribe. If it's not appropriate at summary judgment, it can't be appropriate at the pleading stage. That's the fallacy of the respondent's position here. They want to impose conversion requirements that the Illinois legislature didn't and that the Illinois Supreme Court has not found. Everything about catching someone unprepared or abusing the RID statute, again, if the requirements in terms of the number of RIDs that could be named, they would have done so and this court's precedent in the Long versus I believe it's Matthew case indicates that this court will not read requirements into 2402 that the legislature did not seek to impose itself. And so for those reasons, judges, and on the basis of Cleton and all its progeny, the plaintiff has fulfilled its burden here and we respectfully ask you to reverse the trial court's decision. Thank you, counsel. We'll take the matter under recess for our next case.